# Supreme Court of Texas

═══════════

No. 22-0427

═══════════

Texas Department of Insurance and Cassie Brown, in her Official
Capacity as Commissioner of the Texas Department of Insurance,

*Petitioners*,

v.

Stonewater Roofing, Ltd. Co.,

*Respondent*

═══════════════════════

On Petition for Review from the
Court of Appeals for the Seventh District of Texas

═══════════════════════

**Argued October 26, 2023**

JUSTICE DEVINE delivered the opinion of the Court, in which Chief
Justice Hecht, Justice Lehrmann, Justice Busby, Justice Bland, Justice
Huddle, and Justice Young joined.

JUSTICE BLACKLOCK filed an opinion concurring in the judgment,
in which Justice Boyd joined.

JUSTICE YOUNG filed a concurring opinion.

Insurance adjusters investigate and help effectuate the
settlement of insurance claims. The Texas Insurance Code regulates

three kinds of adjusters: public, independent, and company.[1] Public insurance adjusters represent the insured in the claims-settlement process; the others work on behalf of the insurer.[2] Public insurance adjusters, like the others, must be licensed and are prohibited from acting as both contractor and adjuster in connection with a claim for loss or damage to covered real or personal property.[3] Texas is among more than forty states with similar regulations.[4]

In this declaratory judgment action, a roofing contractor that is not a licensed public insurance adjuster sued to invalidate Texas's licensing and dual-capacity regulations, alleging the laws violate free speech and due process rights guaranteed by the First and Fourteenth Amendments of the United States Constitution. In the trial court, the state regulator prevailed on a Rule 91a motion to dismiss, which asserted that (1) the First Amendment is inapplicable because the challenged laws regulate professional conduct, not speech, and (2) the roofer failed to state cognizable void-for-vagueness claims under the Fourteenth Amendment's Due Process Clause. We agree on both counts.

The challenged statutes do not regulate or restrict speech but, rather, representative capacity with a nonexpressive objective: employment to "act[] on behalf of an insured in negotiating for or

---

[1] *See* TEX. INS. CODE §§ 4101.001–4102.208.

[2] *Compare id.* §§ 4102.001(3) (defining "public insurance adjuster"), .002 (general exemptions), *with id.* §§ 4101.001(a)(1) (defining "adjuster" as including both independent contractors and insurance company employees), .002 (general exemptions).

[3] *See id.* §§ 4102.051, .158, .163; *cf. id.* §§ 4101.001(a), .051, .251.

[4] *See infra* note 17.

effecting the settlement of a claim[.]"[5] Sections 4102.051(a) and 4102.163(a) of the Insurance Code are conventional licensing regulations that are triggered by the role a person plays in a nonexpressive commercial transaction, not what any person may or may not say. The statutes are also clear enough in proscribing the roofer's alleged conduct to preclude both its as-applied and facial vagueness challenges. We therefore reverse the court of appeals' contrary judgment and render judgment dismissing the roofer's claims.

## I. Background

In 2003, the Legislature adopted laws governing "public insurance adjusters" to close a gap in the regulatory scheme and address concerns that unscrupulous contractors were preying on unwary Texans in the aftermath of catastrophic weather events.[6] Now codified as Chapter 4102 of the Insurance Code, the Public Insurance Adjusters Act defines the profession of "public insurance adjuster" as:

---

[5] *See* TEX. INS. CODE § 4102.001 (defining "public insurance adjuster").

[6] *See* Act of June 1, 2003, 78th Leg., R.S., ch. 207, § 3.02, 2003 Tex. Gen. Laws 962, 964-76 (regulating "public insurance adjusters" effective June 11, 2003) (current version at TEX. INS. CODE §§ 4102.001–.208); S. Comm. on Bus. & Com., Bill Analysis, Tex. S.B. 127, 78th Leg., R.S. (2003); H. Rsch. Org., Bill Analysis, Tex. S.B. 127, 78th Leg., R.S. (2003).

Laws regulating insurer-side adjusters had already been in effect for three decades at that point. Act of May 26, 1973, 63d Leg., R.S., ch. 407, §§ 1–23, 1973 Tex. Gen. Laws 1045 (regulating insurance "adjusters") (current version at TEX. INS. CODE §§ 4101.001–.251). Those laws have been amended and expanded from time to time and are now codified as sections 4101.001 through 4101.251 of the Insurance Code.

(A) a person who, for direct, indirect, or any other compensation:

  (i) acts on behalf of an insured in negotiating for or effecting the settlement of a claim or claims for loss or damage under any policy of insurance covering real or personal property; or

  (ii) on behalf of any other public insurance adjuster, investigates, settles, or adjusts or advises or assists an insured with a claim or claims for loss or damage under any policy of insurance covering real or personal property; or

(B) a person who advertises, solicits business, or holds himself or herself out to the public as an adjuster of claims for loss or damage under any policy of insurance covering real or personal property.[7]

Like other insurance adjusters,[8] a person employed or seeking employment as an insured's representative in the settlement of a property-damage claim must be licensed.[9]

To secure a license to adjust insurance claims on an insured's behalf, a person must have sufficient experience or training in the assessment of property values and losses; be sufficiently informed about the terms and effects of typical insurance contracts; and successfully

---

[7] TEX. INS. CODE § 4102.001(3). "'Person' includes an individual, firm, company, association, organization, partnership, limited liability company, or corporation." *Id.* § 4102.001(2).

[8] *See id.* §§ 4101.001(a), .051.

[9] *Id.* § 4102.051(a). Beyond the general exemptions set out in section 4102.002, the following are specifically excused from the licensing requirement: (1) licensed attorneys with sufficient training or experience in assessment of property values and losses; and (2) "a person licensed as a general property and casualty agent or personal lines property and casualty agent under Chapter 4051 while acting for an insured concerning a loss under a policy issued by that agent." *Id.* § 4102.051(b).

pass an examination of the applicant's technical competence, basic knowledge of relevant topics, and understanding of governing law and ethical standards.[10] Unlicensed persons may not advertise, solicit business, or hold themselves out to the public as an insurance adjuster.[11]

Certain conflicts of interest are also prohibited.[12] Among them, a contractor, even if licensed as a public insurance adjustor, "may not act as a public adjuster or advertise to adjust claims for any property for which the contractor is providing or may provide contracting services[.]"[13] In other words, a person may not serve in a dual role—as both contractor and adjuster—in connection with property subject to an insurance claim or falsely advertise an ability to do so. A person violating the statute is subject to administrative, criminal, and civil penalties.[14]

Stonewater Roofing, Ltd. is a professional contractor that provides roofing services to residential and commercial customers. Stonewater is not licensed as a public insurance adjuster but reportedly claims to have extensive experience in facilitating settlement of

---

[10] *Id.* §§ 4102.053, .057.

[11] *Id.* §§ 4102.001(3)(B), .051(a).

[12] *Id.* §§ 4102.158, .163(a); *see id.* §§ 4102.151–.164 (setting out other prohibited conduct).

[13] *Id.* § 4102.163(a); *accord id.* § 4102.158 (prohibiting a licensed public adjuster from engaging in conflicts of interest, including "participat[ing] directly or indirectly in the reconstruction, repair, or restoration of damaged property that is the subject of a claim adjusted by the license holder").

[14] *Id.* §§ 4102.201–.208; *see* TEX. BUS. & COM. CODE § 17.50 (consumer remedies under the Texas Deceptive Trade Practices–Consumer Protection Act).

5

insurance claims.[15]   Website advertising describes Stonewater as an "Insurance Specialist[]" and "The Leader In Insurance Claim Approval" with "a system" it has "developed" to "help[] [its] customers settle their insurance claims as quickly, painlessly and comprehensively as possible."   The roofer also touts itself as "highly experienced with the insurance claims process," having "done thousands of roof restorations due to insurance claims over the years."   Along those lines, the company's customer contracts specifically "authorize" Stonewater "to negotiate on [the customer's] behalf with [the] insurance company and upon insurance approval to do the work specified."

After a dissatisfied commercial customer sued Stonewater for alleged violations of Chapter 4102, Stonewater filed a collateral declaratory-judgment suit against the Texas Department of Insurance and its Commissioner[16] (collectively, TDI) to invalidate the licensing requirement in section 4102.051(a) and the dual-capacity prohibition in section 4102.163(a).[17]   Stonewater contends that these provisions, both

---

[15] When reviewing a motion to dismiss under Rule 91a, we take all pleaded facts as true.  *See* TEX. R. CIV. P. 91a(1).

[16] Commissioner Cassie Brown was automatically substituted as a defendant when her predecessor, Kent Sullivan, ceased to hold office.  *See* TEX. R. APP. P. 7.2(a).

[17] "[I]n so many things, Texas stands alone," *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016), but not here: the vast majority of other states have comparable public insurance adjuster regulations.  *See* ARIZ. REV. STAT. ANN. §§ 20-321(1), 20-321.01; CAL. INS. CODE §§ 15006, 15007, 15028; COLO. REV. STAT. §§ 10-2-103(8.5), 10-2-417(a), (g), (h); CONN. GEN. STAT. §§ 38a-723, 38a-725; DEL. CODE ANN tit. 18, §§ 1750(4), 1751(a), 1758(b)(6); FLA. STAT. §§ 626.112(1)(a), .852(2); .854(1), .869, .8795; GA. CODE ANN. §§ 33-23-1(13), 33-23-4(a)(4), 33-23-43.8(k); HAW. REV. STAT. §§ 431:9-105, 431:9-201(a); IDAHO CODE §§ 41-5802(6), 41-5803; 215 ILL. COMP. STAT. §§ 5/1510, 5/1515; IND. CODE §§ 27-1-27-1(g), 27-1-27-2, 27-1-27-15; IOWA CODE §§ 522C.2,

6

facially and as applied to the roofer's alleged conduct, infringe speech protected by the First Amendment and are void for vagueness under the Fourteenth Amendment's due process clause.[18]

522C.4; KAN. STAT. ANN. §§ 40-5502(l), 40-5503; KY. REV. STAT. ANN. §§ 304.9-020(20), 304.9-430(1), 304.9-4331(6); LA. STAT. ANN. §§ 22:1692(7)-(8), 22:1693, 22:1706; ME. STAT. tit. 24-a, §§ 1402(1), 1411; MD. CODE ANN., INS. §§ 10-401(g), 10-403; MASS. GEN. LAWS. ch. 175, § 172; MICH. COMP. LAWS § 500.1222, 500.1224(4), 500.1227; MINN. STAT. §§ 72B.02(6), 72B.03, 72B.135(4); MISS. CODE ANN. §§ 83-17-501(e), 83-17-503; MO. REV. STAT. §§ 325.010(2), 325.015, 325.055; MONT. CODE ANN. §§ 33-17-102(1), (21), 33-17-301; NEB. REV. STAT. §§ 44-9203(9), 44-9204, 44-9217; NEV. REV. STAT. §§ 684A.020, 684A.030(2), 684A.040; N.H. REV. STAT. ANN. §§ 402-D:2(III), 402-D:3, 402-D:17; N.J. STAT. ANN. §§ 17:22B-2, 17:22B-3; N.M. STAT. ANN. §§ 59A-13-2(6), 59A-13-3, 59A-13-13; N.Y. INS. LAW §§ 2101(g)(2), 2108; N.C. GEN. STAT. §§ 58-33A-5(7), 58-33A-10; N.D. CENT. CODE §§ 26.1-26.8-02(5), 26.1-26.8-03, 26.1-26.8-15; OHIO REV. CODE ANN. §§ 3951.01(B), 3951.02; OKLA. STAT. tit. 36, §§ 6202(2), (4), 6207, 6220.1(A); OR. REV. STAT. §§ 744.502(1), 744.505; 63 PA. CONS. STAT. §§ 1601, 1602, 1605(d); 27 R.I. GEN. LAWS §§ 27-10-1.1(i), 27-10-1.2; S.C. CODE ANN. §§ 38-48-10, 38-48-20, 38-48-130; TENN. CODE ANN. §§ 56-6-902(8), 56-6-903; UTAH CODE ANN. §§ 31A-26-102(5), (8), 31A-26-201, 31A-26-312; VT. STAT. ANN. tit. 8, §§ 4791(4), 4793; VA. CODE ANN. §§ 38.2-1845.1, 38.2-1845.2, 38.2-1845.12(C); WASH. REV. CODE §§ 48.17.010(1)(b), 48.17.060; W. VA. CODE §§ 33-12B-1(i), 33-12B-2; WIS. STAT. §§ 629.01(1), (5), 629.02, 629.10; WYO. STAT. ANN. §§ 26-9-202(xxiii), 26-9-203.

Some states permit similar conflicts of interest with disclosure to the insured or on the principal's written consent. *See* HAW. REV. STAT. § 431:9-244(e); IDAHO CODE §§ 41-5815(4), 41-5818; 215 ILL. COMP. STAT. 5/1575(d), 5/1590; IOWA ADMIN. CODE r. 191-55.14(4), 191-55.17; KAN. STAT. ANN. §§ 40-5514(d), 40-5516; MD. CODE ANN., INS. §§ 10-411, 10-414; MONT. CODE ANN. 33-17-302(4); NEV. REV. STAT. § 684A.165; N.Y. INS. LAW § 2108(s)(2); N.C. GEN. STAT. §§ 58-33A-65(d), 58-33A-80(d); TENN. CODE ANN. § 56-6-917(d).

[18] *See* U.S. CONST. amends. I, XIV. Stonewater's live petition generally asserts that the laws also violate "corresponding provisions" of the Texas Constitution but only prays for a declaration that the laws violate the United States Constitution.

After answering, TDI filed a Rule 91a dismissal motion,[19] arguing that Stonewater's constitutional claims have no basis in law because the statutes (1) regulate professional conduct, which is not protected by the First Amendment, and (2) clearly proscribe Stonewater's alleged conduct, precluding its Fourteenth Amendment as-applied and facial vagueness challenges as a matter of law. The trial court sided with TDI and dismissed the suit.

The court of appeals reversed and remanded.[20] First, the court held that the regulations trigger First Amendment scrutiny because "[t]he business of public insurance adjusting necessarily and inextricably involves speech" and "any conduct under the statute consists of communicating."[21] Going beyond the scope of the Rule 91a motion, the court further concluded that the regulations are subject to strict scrutiny as both content- and speaker-based speech restrictions.[22] In the alternative, the court determined that the First Amendment would still require intermediate scrutiny "even if these prohibitions restrict speech only incidentally in the regulation of non-expressive professional conduct."[23] Second, the court held that Stonewater's vagueness challenges survived because (1) TDI's dismissal motion "failed to fully develop its argument" on the roofer's facial vagueness challenge and (2) the Public Insurance Adjusters Act does not "clearly

---

[19] *See* TEX. R. CIV. P. 91a (mandating early dismissal if a cause of action has no basis in either law or fact).

[20] 641 S.W.3d 794, 803, 805 (Tex. App.—Amarillo 2022).

[21] *Id.* at 802.

[22] *Id.*

[23] *Id.* at 803.

proscribe[]" Stonewater's alleged website and contract statements, which do not equate to "advertising or soliciting oneself as an adjuster of claims" or as "acts on behalf of an insured in negotiating for or effecting the settlement of a claim."[24]

We granted TDI's petition for review to address questions about the proper construction and constitutional implications of state statutes regulating public insurance adjusters.[25]

## II. Discussion

Rule 91a authorizes dismissal of a cause of action that "has no basis in law or fact."[26] TDI's dismissal motion alleged that Stonewater's First and Fourteenth Amendment claims are legally unsound. Under Rule 91a, "a cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought."[27] In addressing that question, "the court may not consider evidence" and "must decide the motion based solely on the pleading of the cause of action, together with any pleading exhibits permitted by Rule 59."[28] Whether a defendant is entitled to dismissal on the pleadings is a legal question we review de

---

[24] *Id.* at 804-05.

[25] To aid the Court, various amici curiae have submitted briefs weighing in on the debate and supporting one side or the other: American Property Casualty Insurance Association; Coalition Against Insurance Fraud; Institute for Justice; Insurance Council of Texas; National Association of Mutual Insurance Companies; National Association of Public Insurance Adjusters; Prof. Rodney A. Smolla; Texas Association of Public Insurance Adjusters; and Texas Civil Justice League.

[26] TEX. R. CIV. P. 91a(1).

[27] *Id.*

[28] TEX. R. CIV. P. 91a(6).

novo.[29]   The issues here are whether Stonewater's pleadings state cognizable speech and due process claims under the First and Fourteenth Amendments.  We agree with the trial court that they do not.

## A. First Amendment: Free Speech

The First Amendment, applied to states through the Fourteenth Amendment, prohibits laws abridging freedom of speech.[30]  As one of "our most cherished liberties,"[31] the right to speak or not speak is afforded robust protection.  Except for certain categories of historically unprotected speech,[32] the government cannot "restrict expression because of its message, its ideas, its subject matter, or its content" unless the regulations survive an exacting standard of judicial scrutiny.[33]  The

---

[29] *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016).

[30] U.S. CONST. amends. I, XIV; *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

[31] *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 381 (1973).

[32] Among the "historic and traditional categories" of constitutionally proscribable speech are obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (collecting cases and quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127 (1991) (Kennedy, J., concurring)).

[33] *Reed*, 576 U.S. at 163 (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality op.) ("Content-based laws are subject to strict scrutiny."); *see Texas v. Johnson*, 491 U.S. 397, 404-06 (1989) (expressive conduct with sufficient communicative elements is subject to heightened First Amendment scrutiny); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561-66 (1980) (heightened, but less than strict, judicial scrutiny applies to regulation of otherwise lawful "speech proposing a commercial transaction" (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978))); *cf. Hill v. Colorado*, 530 U.S. 703, 725-26 (2000) (content-neutral time, place, and

10

government has a much freer hand in regulating commerce and conduct;[34] such laws generally do not offend the First Amendment and are often upheld under rational-basis review.[35]

In the procedural posture of this case, the appropriate degree of judicial scrutiny is not our concern. Nor are we tasked with determining whether the challenged statutes pass constitutional muster. As framed by the Rule 91a motion, the question is more limited and more fundamental: whether the First Amendment applies at all. The answer depends on whether the challenged statutes are directed at protected speech (as Stonewater contends) or not (as TDI maintains).

Construing the statutory language under well-established principles,[36] we have little trouble concluding that sections 4102.051(a)

manner speech regulations must be "narrowly tailored" to "governmental interests that are significant and legitimate").

[34] *See, e.g.*, *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (observing that states "'have broad power to establish standards for licensing practitioners and regulating the practice of professions'" (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975))).

[35] *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018) (laws directed at commerce or conduct typically do not implicate the First Amendment); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) (regulations in areas of social and economic policy that neither employ a "suspect" classification nor infringe on constitutional rights will be upheld against equal protection challenge if there is a rational basis for the classification); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955) (applying rational-basis review to an economic regulation under the Due Process Clause); *see also, e.g.*, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (upholding law on rational-basis review); *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (same).

[36] *See Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019) ("Statutory interpretation involves questions of law that we consider de novo[.]"); *see also City of Austin v. Quinlan*, 669 S.W.3d 813, 821 (Tex. 2023) (statutory terms carry their common, ordinary meaning absent a statutory

and 4102.163(a) do not regulate speech protected by the First Amendment. The parties' debate about that matter rests largely on a misreading of the public adjuster laws, and TDI wins the day because those statutes operate much more narrowly than Stonewater fears.

Section 4102.051(a)'s licensing requirement does not, by its own terms, regulate protected expression: "A person may not act as a public insurance adjuster in this state or hold himself or herself out to be a public insurance adjuster in this state [without a license]."[37] Section 4102.051(a) prescribes what a person *must do*: get a license. The bare mandate of a license pertains to status or capacity, neither of which is speech. Section 4102.051(a) also prohibits holding oneself out as a public insurance adjuster if unlicensed, which involves expression. But there is no question that if the State may permissibly require a license to engage in the profession, it may permissibly prohibit false commercial speech about the same.[38]

---

definition or an absurd result); *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 531-32 (Tex. 2020) ("[W]e read the statute to give effect to every word."); *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) ("Our objective in construing a statute is to give effect to the Legislature's intent, which requires us to first look to the statute's plain language."); *cf.* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 247-51 (2012) (even if a statute is ambiguous, the "constitutional doubt" canon reflects "a judicial policy" that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt").

[37] TEX. INS. CODE § 4102.051(a).

[38] *See, e.g.*, *In re R.M.J.*, 455 U.S. 191, 203 (1982) (inherently misleading or false advertising is not protected by the First Amendment and "may be prohibited entirely"); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980) ("The government may ban . . . commercial speech related to illegal activity."); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 389 (1973) ("Any First Amendment interest which

The same is true for section 4102.163(a)'s dual-capacity prohibition. Whether licensed or not, "[a] contractor may not act as a public adjuster or advertise to adjust claims for any property for which the contractor is providing or may provide contracting services."[39] This is not a speech constraint. Section 4102.163(a) dictates what a contractor *may not do*: undertake a business engagement giving rise to a conflict of interests.[40] Regulated persons are permitted to provide either contracting services or adjusting services but not both types of services for the same property on the same claim. Section 4102.163(a) compels an economic choice about which line of business to pursue; it does not purport to dictate, proscribe, or otherwise limit expression. Like the licensing requirement, the dual-capacity prohibition circumscribes nonexpressive commercial activity. The provision's only speech-related aspect prohibits advertising that is illegal under the statute and, therefore, not protected by the First Amendment.[41]

---

might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.").

[39] TEX. INS. CODE § 4102.163(a).

[40] The Act underscores the conflicting interests that arise in a dual-capacity situation by recognizing the existence of a fiduciary relationship between the insured and a public insurance adjuster with respect to the proceeds of any funds the latter receives or holds on a claim. *Id.* § 4102.111(a) ("All funds received as claim proceeds by a license holder acting as a public insurance adjuster are received and held by the license holder in a fiduciary capacity. A license holder may not divert or appropriate fiduciary funds received or held.").

[41] *See supra* note 38 and accompanying text.

13

None of this is genuinely contested. The nub of the dispute concerns the scope of the defined profession itself, which in turn determines whether the licensing and dual-capacity laws apply to a commercial engagement. In section 4102.001(3), the Public Insurance Adjusters Act subjects a person to regulation as a "public insurance adjuster" if that person "[1] for direct, indirect, or any other compensation . . . [2] acts on behalf of an insured [3] in negotiating for or effecting [4] the settlement of a claim or claims for loss or damage under any policy of insurance covering real or personal property."[42] Stonewater construes "negotiating for or effecting" as entirely communicative and thus dispositive of the definition's expressive aim. But this selective reading of the statutory language misses the forest for the trees. The gravamen of the defined profession is the *role* a person *plays* in a *nonexpressive* commercial transaction, not what anyone may or may not *say*. Giving effect to all of its language, section 4102.001(3) targets nonexpressive commercial activities, not speech.

As defined, the profession's actuating activity and dominant focus is employment in a representative (or agency) capacity.[43] Under state

---

[42] TEX. INS. CODE § 4102.001(3)(A)(i). The defined profession also extends to other activities, including "a person who advertises, solicits business, or holds himself or herself out to the public as an adjuster of claims," but whether those additional activities are within the statute's scope turns entirely on subsection (3)(A)(i)'s definition. *See id.* § 4102.001(3)(A)(ii) (including in the definition a person employed to adjust, advise, or assist in the adjustment of an insurance claim on behalf of a public insurance adjuster), (3)(B) (extending the definition to a person publicly claiming to be an insurance adjuster).

[43] The statute's emphasis on an actor's capacity is confirmed by the Act's exemptions, which exclude from the regulation's ambit certain transaction participants when they are acting in other capacities. *Id.* § 4102.002.

14

law, assuming authority to act "on behalf of" someone else gives rise to a status of legal significance that carries material consequences for the principal and imposes corresponding burdens on the agent.[44] Status and capacity are not speech. Regulation of agency capacity may not invariably suffice to place a professional regulation beyond First Amendment scrutiny, but our conclusion that such scrutiny is not required here is sealed by the profession's notably discrete objective: settlement of a claim under an insurance contract. In this context, "settlement" refers to "payment, satisfaction, or final adjustment" of an insurance claim,[45] which is not speech.

It is true that "negotiating for" and "effecting" a settlement can involve communicative endeavors.[46] And it is true that both the

---

[44] *See, e.g.*, *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) (holding that an agent acting within the scope of apparent authority binds the principal); *see also Lesley v. Veterans Land Bd. of State*, 352 S.W.3d 479, 490 (Tex. 2011) ("A fiduciary duty . . . for agent and principal . . . 'requires a party to place the interest of the other party before his own[.]'" (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992))); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) ("[A]gency is also a special relationship that gives rise to a fiduciary duty. . . . 'The agreement to *act on behalf of the principal* causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.'" (emphasis added) (quoting RESTATEMENT (SECOND) OF AGENCY § 13, cmt. a (AM. L. INST. 1958))); RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. e (AM. L. INST. 2005) ("[An] agent owes a fiduciary obligation to the principal.").

[45] BLACK'S LAW DICTIONARY at 1650 (11th ed. 2019); *see, e.g.*, *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 758 (Tex. 2020) (when construing a statute, undefined terms carry their ordinary meaning as informed by the context of the statute as a whole).

[46] Neither "negotiating" nor "effecting" is necessarily nor unfailingly communicative. "Effect" means "[t]o bring about; to make happen," BLACK'S

---

15

actuating activity (representative capacity) and the commercial objective (settlement of an insurance claim) may be manifested or carried out by those activities. But under a plain reading of the statute, speech is not remotely the defining characteristic of the public insurance adjuster's job.

In fact, settling a property-loss claim implicates a great deal of nonexpressive activity that the Public Insurance Adjusters Act regulates only in the context of an agency relationship: evaluating insurance coverage, assessing property value, assessing property damage, and calculating repair costs.[47] When an agency relationship has been established, communicating with the insurer and insured and

LAW DICTIONARY at 651, and in this context could include myriad nonexpressive actions such as signing or exchanging settlement documents, accepting payments as the insured's representative, and assessing property values, property losses, and repair costs. "Negotiate" can encompass both expressive and nonexpressive activities. "Negotiating" may refer to "communicat[ing] with another party for the purpose of reaching an understanding" or "bring[ing] about by discussion or bargaining." *Id.* at 1248. The term may also refer to "transfer[ing] (an instrument) by delivery or indorsement" including under circumstances "whereby the transferee becomes its holder." *Id.* Section 4102.001(3)'s use of the linking word "for" suggests the first usage: communication, discussion, or bargaining to reach a settlement. But the second usage would also fall under the broader term "effecting," given that a public insurance adjuster's status as the insured's agent enables the adjuster to receive and hold funds for the insured's benefit as a fiduciary. *See supra* note 40.

[47] *See* TEX. INS. CODE §§ 4102.053(a)(6)–(7) (a public insurance adjuster license may only be issued to a resident applicant with "sufficient experience or training relating to the assessment of: (A) real and personal property values; and (B) physical loss of or damage to real or personal property that may be the subject of insurance and claims under insurance" and who "is sufficiently informed as to the terms and effects of the types of insurance contracts that provide coverage on real and personal property"), .054(6)–(7) (same for a nonresident applicant).

advocating for coverage would also fall under the umbrella of a public insurance adjuster's job. But whether expressive elements are encompassed or not, "negotiating" and "effecting" are merely incidental to the nonexpressive commercial activities delimiting the profession. The First Amendment does not reach those activities even though they may be evidenced or effectuated by speech.[48] As the Supreme Court recently reaffirmed: "'[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech,' and professionals are no exception to this rule."[49]

Incorporating section 4102.003(a)'s definition of the profession, neither section 4102.051(a) nor section 4102.163(a) purports to regulate what a person may or may not say or to whom they may or may not speak.[50] None of the challenged statutes is activated by what a person

---

[48] *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets)[.]").

[49] *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 769 (2018) (citations omitted) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)); *compare Rumsfeld v. F. for Acad. & Inst'l Rts. (FAIR)*, 547 U.S. 47, 62 (2006) (explaining that regulation of nonexpressive activity need not be analyzed as a speech regulation despite incidentally compelling speech), *with Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456-57 (1978) (noting that communications incident to conduct may be regulated "without offending the First Amendment," but because "commercial speech" was an "essential" component of the activity being regulated—a lawyer's in-person solicitation of business—the First Amendment was implicated under a lower level of judicial scrutiny "commensurate with its subordinate position in the scale of First Amendment values").

[50] *See FAIR*, 547 U.S. at 60-62 (finding the First Amendment inapplicable to a law regulating what a person "must *do*" instead of "what they may or may not *say*"); *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S.

says about property subject to an insurance claim or to whom they say it but, rather, activities undertaken in the settlement of an insurance claim under the auspices of a commercial representative relationship. Properly construed, sections 4102.003(a), 4102.051(a), and 4102.163(a) apply based only on the legal status or relationship a person holds or seeks to secure with respect to the insured in a nonexpressive transaction. Speech may be an adjunct to the regulated relationship, but none of these provisions can be fairly characterized as limiting, proscribing, prescribing, or otherwise regulating protected speech.[51]

---

781, 796-97 (1988) ("[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say.").

[51] The First Amendment precedent Stonewater relies on is readily distinguishable as involving laws plainly directed at regulating communicative content. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality op.) (statutory exception from robocall restriction favoring debt-collection speech over all other speech, including political speech, was "about as content-based as it gets"); *Becerra*, 585 U.S. at 762-66 (laws compelling dissemination of government-drafted notices were "content-based" because they altered the content of speech); *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (sign code that subjected ideological signs, church direction signs, and political signs to differing restrictions was a facially content-based speech regulation); *Sorrell*, 564 U.S. at 563-64 (restrictions on the sale, disclosure, and use of prescriber-identifying information that applied only to pharmaceutical manufacturers and marketers and not "a wide range of other speakers" were "on [their] face" "content- and speaker-based rules"); *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010) (statute's "material support" prohibition extended to giving advice based on "specialized knowledge," but not "general . . . knowledge," to designated terrorist organizations, so liability "depend[ed] on what they say"); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 375-76 (1984) (law restricting "the expression of editorial opinion on matters of public importance").

Any incidental impact on speech is not sufficient to bring the First Amendment into play.[52]

We therefore hold that Stonewater has not stated a cognizable First Amendment claim and the trial court properly sustained TDI's Rule 91a challenge.

### B. Fourteenth Amendment: Vagueness

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause,"[53] which is applicable to the states through the Fourteenth Amendment.[54] In its second issue, TDI argues, as it did in its Rule 91a dismissal motion, that Stonewater's facial vagueness claim has no basis in law because its as-applied

---

[52] *See FAIR*, 547 U.S. at 61-62 (law that neither dictated the content of speech nor prohibited speech regulated only conduct and did not abridge First Amendment rights even though ordinarily accompanied by speech). In urging that the First Amendment applies to "regulation of conduct that incidentally impacts speech," Stonewater conflates incidental speech impacts with conduct that is "inherently expressive" and tantamount to "symbolic speech." *See id.* at 65-66. The distinction between the two concepts is elucidated in *FAIR*, which involved a federal law limiting higher-education funding to those institutions affording military recruiters access to students on par with other recruiters. *Compare id.* at 61-62, 65 (holding that any speech compelled by that statute was incidental to the law's regulation of conduct, so the law did not "impermissibly regulate[] *speech*"), *with id.* at 65-68 (determining that the regulated conduct was not "inherently expressive" for purposes of *O'Brien*'s intermediate scrutiny standard while explaining that "First Amendment protection [extends] only to conduct that is inherently expressive" (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968))). Because this case does not involve inherently expressive conduct, *O'Brien* and its progeny have no bearing on the issues before us.

[53] *United States v. Williams*, 553 U.S. 285, 304 (2008); *see* U.S. CONST. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law . . . .").

[54] *Welch v. United States*, 578 U.S. 120, 124 (2016); *see* U.S. CONST. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").

vagueness claim fails as a matter of law. That is, because sections 4102.051(a) and 4102.163(a) clearly proscribe Stonewater's alleged actions, the roofer cannot mount a successful facial attack on those statutes.

The court of appeals declined to consider the merits of Stonewater's facial vagueness claim on the basis that (1) TDI's dismissal motion did not "fully develop its argument on this point" and (2) it was therefore unclear whether "the trial court necessarily considered Stonewater's facial vagueness claim as part of the as-applied claim."[55] We disagree with that assessment. TDI's dismissal motion pointedly tethered the merits of a facial attack to the merits of Stonewater's as-applied challenge; the trial court's dismissal order just as clearly rendered a final judgment dismissing all claims; and the viability of both claims is properly before us on appeal. Even so, our analysis is focused on the effect of vagueness as applied to Stonewater's alleged conduct because that is how TDI's Rule 91a motion framed the issues.

An as-applied challenge, as the name suggests, asserts that a statute is unconstitutional in its particular application to the challenger even if it operates constitutionally in other applications.[56] Although "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,"[57] Stonewater disputes that its facial vagueness claim hinges on the validity of its as-applied challenge. Stonewater contends that

---

[55] *See* 641 S.W.3d 794, 804-05 (Tex. App.—Amarillo 2022).

[56] *In re Commitment of Fisher*, 164 S.W.3d 637, 656 n.17 (Tex. 2005).

[57] *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).

controlling precedent relaxes the general rule "when the assertedly vague statute has the potential to affect First Amendment freedoms,"[58] and because the public adjuster statutes do just that, "the potential to chill some protected expression" permits Stonewater to complain about vagueness as applied to others regardless of any constitutional infirmity as applied to Stonewater.[59]

Even if a relaxed standard applies in free speech cases—which TDI contests, but we need not decide[60]—we have already determined

---

[58] *Comm'n for Law. Discipline v. Benton*, 980 S.W.2d 425, 438 (Tex. 1998).

[59] *See id.* (when First Amendment rights are implicated, a relaxed rule "'is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights'" (quoting *Gooding v. Wilson*, 405 U.S. 518, 521 (1972))).

[60] *Compare Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010) (explaining the difference between First Amendment overbreadth and due process vagueness in addressing the lower court's improper consideration of "facts not before it" in evaluating an as-applied vagueness claim: "'[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,'" and "[t]hat rule makes no exception for conduct that is in the form of speech," so "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others. Such a plaintiff may have a valid overbreadth claim under the First Amendment" but not a vagueness claim (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 495)), *with Benton*, 980 S.W.2d at 438 (applying the relaxed rule for considering facial-vagueness challenge to law impinging freedom of speech), *and State v. Doyal*, 589 S.W.3d 136, 144-45 & n.33 (Tex. Crim. App. 2019) (concluding that *Johnson v. United States*, 576 U.S. 591 (2015), "appears to have disavowed" *Holder* "without naming [it]" by broadly stating that despite "'statements in some of our opinions . . . our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp'" (quoting *Johnson*, 576 U.S. at 602)). *But see Doyal*, 589 S.W.3d at 168-70 (Yeary, J., dissenting) (stating that *Holder*'s "clear holding"

that sections 4102.051(a) and 4102.163(a) do not implicate First Amendment rights. That being so, we must first examine the law as applied to Stonewater's conduct before considering other hypothetical applications of the law.[61] And if Stonewater's as-applied claim fails, so too does its facial vagueness claim.[62]

Under settled principles, a vague statute offends due process in two ways. First, it fails to give fair notice of what conduct may be punished, forcing ordinary people to guess at the statute's meaning.[63] Second, the statute's language is so unclear that it invites arbitrary or discriminatory enforcement.[64] Stonewater asserts that the Public Insurance Adjuster Act's licensing and dual-capacity provisions flunk the due-process inquiry for both reasons.

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."[65] More leeway is allowed for economic regulations because the "subject matter is often more narrow, and because businesses . . . can be expected to consult relevant

---

had not been repudiated *sub silentio* and expressing skepticism that the majority's analysis "reflects an accurate statement of the law").

[61] *See Vill. of Hoffman Ests.*, 455 U.S. at 495; *accord Ex parte Barton*, 662 S.W.3d 876, 885 (Tex. Crim. App. 2022) ("[B]ecause § 42.07(a)(7) does not regulate speech and therefore does not implicate the free-speech guarantee of the First Amendment, Appellant, in making his [facial] vagueness challenge to that statutory subsection, was required to show that it was unduly vague as applied to his own conduct." (citation and quotation marks omitted)).

[62] *Holder*, 561 U.S. at 20; *Vill. of Hoffman Ests.*, 455 U.S. at 495.

[63] *Holder*, 561 U.S. at 18.

[64] *Vill. of Hoffman Ests.*, 455 U.S. at 498.

[65] *Id.*

22

legislation in advance of action."[66] Statutes authorizing criminal penalties, like this one,[67] carry qualitatively more severe consequences, so "fair notice" may warrant more precision than when only civil penalties are at stake.[68]

Although "a more stringent vagueness test" may also apply when a statute interferes with freedom of speech,[69] that is not the case here. But even if it were, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."[70] Due process is satisfied so long as the prohibition is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with."[71] "Because we are concerned with whether an enactment gives 'fair notice to those to whom [it] is directed,'" the "ordinary person" standard refers to those persons subject to regulation—in this case, contractors and public insurance adjusters.[72]

---

[66] *Id.* (footnote omitted).

[67] TEX. INS. CODE § 4102.206(a) ("A person commits an offense if the person violates this chapter. An offense under this subsection is a Class B misdemeanor.").

[68] *Vill. of Hoffman Ests.*, 455 U.S. at 499.

[69] *Holder*, 561 U.S. at 19, 21 (quoting and applying *Village of Hoffman Estates*, 455 U.S. at 499, in a dubious tone).

[70] *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

[71] *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973) (quoting *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 578-79 (1973)); *see United States v. Davis*, 588 U.S. 445, 451 (2019) ("Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926))).

[72] *Comm'n for Law. Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972)); *see id.*

Stonewater alleges that it "regularly communicates directly with the customer's insurer" to provide factual information about repairs and to respond to requests for information about property damage, the scope of necessary repair work, estimated costs, and repair methods. The statute does not prohibit a contractor like Stonewater from talking to its customers or an insurer about repairs that are subject to a pending insurance claim and providing information of this nature. TDI's formal guidance confirms this understanding, stating that contractors may "discuss" and "answer questions about" topics like "the amount of damage to the consumer's home," "the appropriate replacement," "reasonable cost of replacement," "estimate for a consumer's claim," "the scope of work in [a] repair estimate," or "supplements and clarifications concerning the revised estimate."[73] The statute does not prohibit contractors from sharing their knowledge and expertise about repairs. Indeed, the foregoing is the type of information that would be pertinent any time damaged property needs repair, not just in the context of an insurance claim.

But TDI's formal guidance is oversimplified in stating that the Public Insurance Adjusters Act prevents contractors from "discuss[ing] insurance policy coverages and exclusions" or "advocat[ing] on behalf of

---

(framing the inquiry as "whether the ordinary lawyer, with the benefit of guidance provided by case law, court rules, and the lore of the profession, could understand and comply with [the law]" (quoting *Howell v. State Bar of Tex.*, 843 F.2d 205, 208 (5th Cir. 1988) (quotation marks omitted)).

[73] *See* TEX. DEP'T OF INS., *Frequently Asked Questions: Unlicensed Individuals and Entities Adjusting Claims* at 1 (2014), https://www.tdi.texas.gov/bulletins/2014/documents/unlicensedfaq.pdf.

a consumer."[74]  The Act constrains such activities only in connection with engagement as the insured's representative or agent in the claims-settlement process.  Because the statute is implicated only by the role a person plays in the settlement transaction, we understand the formal guidance as referring to the possibility that communications of the described nature can evidence a prohibited engagement,[75] not that the Public Insurance Adjusters Act regulates such communications for all purposes.[76]

In this case, the regulated relationship is what proves problematic for Stonewater under the allegations in the pleadings, which we take as true under Rule 91a.  Although Stonewater is not a licensed public insurance adjuster, its form contracts expressly authorize it to "negotiate" with the insurance company "on the customer's behalf" and perform construction work "upon insurance approval."  Stonewater's website messaging also describes the roofer as "The Leader In Insurance Claim Approval," a "Trusted Roofing and Insurance Specialist[]," "highly experienced with the insurance claims process," and the developer of "a system which helps [its] customers settle their insurance claims as quickly, painlessly and comprehensively as possible."  These contracting and advertising activities, viewed together or in their respective buckets, fall plainly within the scope of a "public insurance adjuster" as statutorily defined and regulated.

---

[74] *Id.*

[75] *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (observing that words can sometimes violate laws directed at conduct).

[76] Whether and to what extent such communications are subject to regulation under other law is outside the scope of this opinion.

As TDI says, Stonewater's form contract practically recites the statutory definition of the profession. Not only does the contractual engagement run afoul of section 4102.051(a)'s licensing requirement, it also squarely invokes section 4102.163(a)'s dual-capacity prohibition by contracting for authority to both negotiate settlement of a claim *and* perform the ensuing repair work. Sections 4102.051(a) and 4102.163(a) do not merely prohibit the actual conduct; they also prohibit a person from illegally claiming an ability to engage in that conduct and agreeing to provide prohibited services.[77] The website statements are less explicitly proscribed, but the messaging, which is the sum of its parts, describes conduct an ordinary industry participant exercising common sense would understand to violate section 4102.051(a)'s prohibition on an unlicensed person acting, advertising, or holding itself out as an insurance adjuster. The touchstone is fair notice, not an exhaustive articulation of prohibited conduct,[78] and the challenged provisions of the Public Insurance Adjusters Act easily surpass that threshold to survive Stonewater's as-applied challenge. Accordingly, both the as-applied and facial vagueness claims fail as a matter of law. We therefore need not,

---

[77] TEX. INS. CODE §§ 4102.001(3) (defining the profession in terms of an agreement to be paid for such services), .051(a) (prohibiting unlicensed persons from holding themselves out as a public insurance adjuster), .163(a)(1) ("A contractor may not act as a public adjuster or advertise to adjust claims for any property for which the contractor is providing or may provide contracting services, regardless of whether the contractor [is a licensed public insurance adjuster].").

[78] *See United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").

26

and do not, consider whether the statutes might be vague as applied to hypothetical situations not before us.

### III. Conclusion

Stonewater failed to state cognizable First and Fourteenth Amendment speech and vagueness claims. Because the trial court properly granted TDI's Rule 91a dismissal motion, we reverse the court of appeals' judgment and render judgment dismissing the case.

_____

John P. Devine
Justice

**OPINION DELIVERED:** June 7, 2024